# In the United States Court of Federal Claims

No. 11-376C
(Filed October 12, 2011)

```
* * * * * * * * * * * * * * * * * * * *
                                     *
U.S. FOODSERVICE, INC.,              *
                                     *
                   Plaintiff,        *
                                     *
        and                          *
                                     *
LABATT FOOD SERVICE, L.P.,           *
                                     *
             Plaintiff-Intervenor,   *
                                     *
        v.                           *
                                     *
THE UNITED STATES,                   *
                                     *
                   Defendant.        *
                                     *
* * * * * * * * * * * * * * * * * * * *
```

Pre-award bid protest; 28 U.S.C. § 1491(b)(1) (2006); judgment on the administrative record, RCFC 52.1; ripeness; reasonableness of Class Waiver pursuant to 48 C.F.R. (FAR) § 12.302(c) (2011); irrationality or unreasonableness of non-commercial methodology adopted by agency for procurement.

Rebecca E. Pearson, Washington, DC, for plaintiff. James Y. Boland, Venable LLP; Glen M. Kurtz and Douglas P. Baumstein, White & Case LLP, New York, NY; and David B. Eberhardt, Miles & Stockbridge, PC, Baltimore, MD, of counsel.

Jonathan M. Bailey, San Antonio, TX, for plaintiff-intervenor. Christopher G. Burwell, Bailey & Bailey, PC, of counsel.

Austin M. Fulk, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Keith Levinson and Kristin Bray, Defense Logistics Agency, Philadelphia, PA, of counsel.

## MEMORANDUM OPINION AND ORDER 1/

---

1/ This opinion originally was filed under seal on September 27, 2011. The parties were requested to notify the court of any redactions. All redactions requested are denoted by brackets.

**MILLER**, Judge.

This pre-award bid protest is before the court after argument on the parties' cross-motions for judgment on the administrative record.  The issue presented is whether the Department of the Army Defense Logistics Agency Troop Support ("DLA Troop Support") has issued a solicitation to nationwide food distributors that, in departing from customary commercial practice, contains arbitrary and capricious terms to which no offeror can respond.

**FACTS**

I. Background

In today's marketplace food-service distributors, such as plaintiff U.S. Foodservice, Inc. ("USF"), and plaintiff-intervenor Labatt Food Service, L.P. ("Labatt") (sometimes jointly referred to as "plaintiffs"), act as wholesalers of food and supplies.  The distributors purchase products from manufacturers, other suppliers, and vendors that purchase directly from manufacturers and farmers; and the distributors then provide those products to their customers—generally those entities that serve food directly to the public.  The food-service distribution industry is a highly competitive marketplace with recognized thin profit margins, and as a whole is sensitive to all changes in the marketplace.  As such, a complex system of pricing has been developed within the industry attempting to account not only for the constantly fluctuating prices of food and transportation costs, but also for the services and efficiencies that the distributors are able to provide in purchasing and delivering food to their customers.

The basic commercial model 2/ in today's food-service distribution industry is best understood as a simple equation: Reference (or "Delivered") Price + Distribution Price = Unit Price.  See USF's Br. filed July 8, 2011, at 10.  This equation represents the common pricing method in which a markup—the "Distribution Price"—is added to a reference "market price," which customarily is established from the invoice price paid by a distributor's distribution center, plus inbound transportation costs.  See id.  The complexity arises from how each of these terms is defined and what costs are allocated to each category.  Distribution Price is relatively straightforward.  It is either a percentage markup or a fixed-price dollar amount that is added to the reference price for each product, and it generally represents the transportation costs of getting a product from the distribution center to the

_____

2/  USF sketched the commercial landscape in its opening brief to which Labatt agreed, see USF's Br. filed July 8, 2011, at 10-13; Labatt's Br. filed July 12, 2011, at 3, and defendant did not take issue with it.  This background information serves only to depict the commercial practices from which DLA Troop Support departed.  Its accuracy is not critical to the resolution of USF's and Labatt's protests.

customer.  In the past DLA Troop Support has used the fixed-fee method of setting the Distribution Price.  See id. at 10.

Within customary commercial practice, the more complex component is the Delivered Price, which usually is the amount paid by the distribution center to the vendor, manufacturer, or grower that sold the distributor the product.  See id. at 11.  In calculating the Delivered Price, distributors strive to ensure that customers buying similar quantities of the same product from inventory, at the same time, from the same geographic location, and under similar terms, will be paying the same Delivered Price.  This means that Delivered Price often will be based on the market price of the particular good at the time that it is sold.  However, this price is not representative of the base "cost" of the product as it is normally understood because Delivered Price is adjusted based on  market freight—including freight income—from the last supplier to the distribution center and also the "earned income" obtained by the distributor.  See id.  As described by USF, earned income "is revenue, including potential profit, paid by participants in the supply chain [of the product]."  Id.  Within the food-service industry, earned income can include "promotional allowances, cash discounts, prompt pay discounts, growth programs, freight allowances and other transactional payments."  Id.  Earned income is also paid to the distributors for the value-added services they provide—either to the end customer or the supplier.  These value-added services can include "regional and national marketing, freight management, procurement leverage, consolidated warehousing, quality assurance, and performance based product marketing." Id. 3/

One last caveat that the food-service distribution industry includes within the concept of "Delivered Price" is private arrangements as to product price that are negotiated directly by the end customer and the manufacturer.  These arrangements are known as "deviated pricing arrangements," and they often represent a Reference/Delivered Price that is agreed to outside the general market conditions and is different from what the distributors would charge for the same good bought from their general inventory.  See id. at 12.  In such cases, where the distributor acts as a mere middleman with no control over the Delivered Price, the distributor will deliver the product to the customer at the deviated price, but then "bill back" to the manufacturer the difference between what the distributor normally would charge and the deviated price.  The manufacturer then pays the distributor the difference in prices.  See id.  These arrangements customarily are negotiated between manufacturers and large, sophisticated customers—such as DLA Troop Support—that buy large quantities of goods and seek better than market prices for the products.

---

3/  Labatt also argues that fixed annual pricing is a commercial practice.  See Labatt's Br. filed July 12, 2011, at 13-15.  However, there seems to be no indication that fixed annual pricing is considered a "customary" practice within the food-service distribution industry.

Within this commercial model, customers—including DLA Troop Support in the past—evaluate proposals based on the total price of a market basket of goods. The customer then usually selects the proposal with the best offered price after taking into account non-price elements such as service performance. The different unit prices in each offeror's proposal represent the differing supply chains and business models of the individual food service distributors. See id. at 12-13. For example, one distributor may provide more or fewer services in acquiring and transporting products, have different levels of vertical integration from the manufacturer/grower level to the end delivery level, or simply offer products from a different set of vendors than other distributors. Because of the varying business models within the industry, reference/delivered prices paid for like goods are not uniform from one distributor to the next, even if the total unit prices may be similar. See id. at 13. This explains why, typically, customers would consider total price paid for a basket of goods rather than emphasizing a single component of the pricing equation.

## II.  The Distribution Price modifier and the class waiver

Concerned about repeated incidents of fraud in the delivery of food-stuff items, DLA Troop Support began to explore new methods of evaluating Sustenance Prime Vendor Solicitations in an effort to increase the transparency of the costs billed to the Government under these contracts. 4/ In April 2010 DLA Troop Support first begin to consider using a weighting factor to be applied to the fixed element of Distribution Price. See AR 3919. After considering the matter, in August 2010, DLA Troop Support decided to require the weighting of the fixed-distribution price by a factor of 20 when evaluating the pricing submissions in the CONUS (Continental United States) Prime Vendor Solicitations. 5/ See

---

4/  DLA Troop Support articulated these concerns about fraud during plaintiffs' protests before the General Accountability Office. They were not included in the Class Waiver for the Inclusion of Provisions/Clauses in Prime Vendor Commercial Acquisitions Inconsistent with Customary Commercial Practices, discussed *infra*. The court notes them and does not discount them, as plaintiffs urge, as a *post hoc* rationale on the ground that their aegis was fraud in procuring food for the war effort in Afghanistan—an OCONUS (Outside Continental United States) procurement. DLA Troop Support had encountered fraudulent activities in the industry since at least early 2000, including one domestic incident involving USF that led to a settlement and payment by USF without admission of liability.

5/  DLA Troop Support arrived at the number 20 by evaluating the relative percentages of Distribution Price and Delivery Price within the Unit Price. Because DLA Troop Support found that, historically, Distribution Price normally represented only 10% of Unit Price, it decided to multiply the Distribution Price by 10 to make Distribution Price roughly equal in weight to Delivery Price. Because Delivered Price constantly was fluctuating with the market, DLA Troop Support also deemed that more emphasis should be placed on the fixed Distribution Price to ensure that the proposals more accurately conveyed

AR 3919-21.  DLA Troop Support reasoned that this emphasis on the fixed Distribution Price would aid it in evaluating pricing proposals because it would emphasize the known fixed element of cost, thereby reducing government reliance on the variable price element—Delivered Price—that historically had fluctuated by as much as 191% annually. See AR 1.

The introduction of the multiplier to the evaluation process was not the only change from the commercial practices that DLA Troop Support determined was necessary to meet the need for enhanced transparency in pricing.  To address its concerns, DLA Troop Support had to take additional action.  Specified deviations from general commercial practices cannot be justified absent a formal waiver.  Pursuant to 48 C.F.R. (FAR) § 12.302(c) (2011), and Defense Logistics Acquisition Directive ("DLAD") 12.302(c), Thomas Daley, the Director of Subsistence Supplier Operations within DLA Troop Support, executed on October 22, 2010, a Class Waiver for the Inclusion of Provisions/Clauses in Prime Vendor Commercial Acquisitions Inconsistent with Customary Commercial Practices (the "Waiver" or "Class Waiver").  6/  AR 63-67.  The Waiver set forth reasons why certain provisions that were inconsistent with customary commercial practices were required for the upcoming solicitations for commercial subsistence items.  See id.  The provisions listed the Waiver were, as follows:  FAR clauses 52.215-9007 (Preproposal Conference), 52.216-9064 (Economic Price Adjustment ("EPA") - Actual Material Costs for Subsistence Delivered Price Business Model (NOV 2009)), 52.246-9044 (Sanitary Conditions), and 52.247-34 (F.O.B. Destination); Defense Federal Acquisition Regulation Supplement ("DFARS") 252.204-7003 (Control of Government Personnel Work Product (APR 1992)); as well as provisions dealing with Rebates/Discounts and Price-Related Provisions, Socioeconomic Support, and AbilityOne Evaluation.  Id.  Regarding the EPA clause, DLA Troop Support explained:

> It would not be practical or possible to adjust the prices of food service delivery suppliers in a changing marketplace via the use of a single index.  Further, it would not be possible for DLA TROOP SUPPORT contracting personnel to establish the fairness and reasonality [sic] of prices under contracts with the use of this unique EPA clause.

---

5/  (Cont'd from page 4.)

what the food distributors would be charging the Government under a contract.  Hence, DLA Troop Support decided to multiply Distribution Price by 2.  Thus, 10x2 = 20.  Both USF and Labatt assailed the premises underlying this weighting.

6/  The parties do not dispute that Director Daley was, in fact, one level above the contracting officer.

AR 63-64.  Additionally, the Waiver justified the use of the "Rebates/Discounts and Price-Related Provisions" clause, which was inconsistent with commercial practice, based on the following reasoning:

> It is DLA's objective to clarify the terms used by the prime vendors and the agreements that are established between manufacturers and distributors as related to rebates/discounts and product pricing.  DLA seeks to avoid excessive pass through charges from multiple sources along the supply chain (manufacturer/grower to dealer to distributor to consolidator, etc.) to protect the taxpayer.  Therefore the rebates/discounts and price related provisions definition is designed to promote pricing transparency and place integrity into the commercial pricing process.  This is achieved by requiring the prime vendor to provide proof of the delivered price portion of the unit price via invoice documentation of FOB origin/point of manufacture, documentation of discounts, rebates, allowances or other similar economic incentives, and other supporting documentation as needed.

AR 65.

III.  The Solicitation

On October 27, 2010, DLA Troop Support issued Solicitation No. SPM300-10-R-0047 (the "Solicitation") for proposals to provide food and beverage support to included military and civilian customers in the Texas and New Mexico region of the United States.  See AR 826-1047. 7/  The awardee was to serve as a Subsistence Prime Vendor for Texas and New Mexico and to provide full-line food service items.  See id.  The original Solicitation estimated a total projected contract value of $9,300,000.00 over a fourteen-month period, including a two-month implementation period followed by a twelve-month base period.  See AR 865-66.  Because the Solicitation's terms led to the present dispute, a closer examination of certain elements of the Solicitation is required. 8/

---

7/  This Solicitation was the first of fifteen solicitations eventually issued by DLA Troop Support.  Between May 10-31, 2011, DLA Troop Support issued fourteen more solicitations with identical terms to the solicitation at issue to cover all geographic regions of the continental United States.  See generally AR 1191-3918.  As the terms of the additional solicitations are identical to the terms of the Solicitation, and the parties focused solely on the Texas/New Mexico Solicitation in briefing and arguing this protest, the court similarly confines its discussion and analysis to the Solicitation.

8/  The Solicitation was amended twelve times.  References made to the terms of the Solicitation are to the Solicitation as originally issued unless otherwise noted.

Having departed from traditional commercial practice and terminology via the execution of the Waiver, DLA Troop Support supplied its own definitions for the terms used in the Solicitation. Regarding the pricing terms used, DLA Troop Support chose to use EPA Clause, DLAD 52.216-9064 - Economic Price Adjustment (EPA) Actual Material Costs for Subsistence Delivered Price Business Model (NOV 2009), in order to provide notice to potential offerors how to modify their commercial methods to structure their proposals. AR 857-60. Section (a) of this clause states: "The Contractor warrants that—(1) Contract Unit Prices covered by this contract do not include allowances for any portion of the contingency covered by this clause; and (2) All prices invoiced under this contract shall be computed in accordance with the provisions of this clause." AR 857.

Beginning first with the total "Unit Price" of the goods, section (b)(1) of the EPA clause defined "Contract Unit Price" as "the total fixed price per unit charged to DLA TROOP SUPPORT for a product delivered to DLA TROOP SUPPORT's customers" and expressed that the Unit Price would consist of two components: the "Delivered Price" and the "Distribution Price." Id. The Unit Price was to be calculated by summing the two component prices and then rounding up or down, as appropriate, to the nearest cent. Section (b)(2) defined "Delivered Price" as

> the most recent supplier price per unit to the Contractor, inclusive of standard freight, for that product delivered to the initial point of entry into the Contractor's distribution network (normally referred to as the landed or delivered price). For this contract, the Delivered Price shall be the contractor's last Delivered Price through close of business Tuesday, 5 PM ET for submission not later than Wednesday, 2 PM ET for updating the following week's Ordering Catalog price. The Delivered Price shall have any and all Product Allowance subtractions made prior to presenting the Delivered Price to DLA TROOP SUPPORT.

AR 857-58. This definition later was amended by Solicitation Amendment 0007. 9/ The final amended "Delivered Price" definition reads, as follows:

> (a) "Delivered Price" is the most recent manufacturer/grower/private label holder invoice price per unit charged to the Contractor, inclusive of standard freight, for that product delivered to the initial point of entry into the Contractor's distribution network (normally referred to as the landed or delivered price). For this contract, the Delivered Price shall be the contractor's last Delivered Price through close of business Tuesday, 5 PM ET for

---

9/ All Solicitation amendments are discussed infra.

submission not later than Wednesday, 2 PM ET for updating the following week's Ordering Catalog price.  The Delivered Price shall have any and all Product Allowance subtractions made prior to presenting the Delivered Price to DLA TROOP SUPPORT.

(I)   Exception:  A  redistributor's  price  for  a  specific manufacturer/grower/private label holder's product (SKU) may be considered by the Government as long as the redistributor's price for the quantity ordered is equal to or lower than the manufacturer's/grower's/private label holder's published price inclusive of discounts/allowances.  This exception must be approved by the Contracting Officer on a case by case basis.  Supporting documentation may be required.

(b) The Delivered Price includes Standard Freight, i.e. the transportation charge for delivery from the manufacturer/grower/private label holder to the initial point of entry into the Contractor's distribution network.  In the event the  Contractor  picks  up  product  FOB  Origin  from  a manufacturer/grower/private  label  holder,  or  arranges  for  delivery transportation  from  a  third  party  source  other  than  the manufacturer/grower/private label holder, the manufacturer/grower/private label holder's invoice price shall be an origin price as reduced by any manufacturer/grower/private label holder pick-up allowance.  Also, in the event the Contractor picks up product FOB Origin, or arranges for third party common carrier transportation to its facility, the standard freight charge shall be based on market tariffs/conditions and shall not exceed:

(I)   the  manufacturer/grower/private  label  holder's,  or manufacturer/grower/private label holder's carrier's freight price normally payable by the Contractor for inbound shipments of such products and quantities to the Contractor's distribution point; or

(ii) an average price based on market conditions for freight in the same market for the same type of freight service for like products, shipping methods and quantities.

AR 1127-28.

Section (b)(3) defined "Product Allowance" as the "discounts, rebates, and allowances to be passed on to the Government."  AR 858.  Section (b)(3) further stated:

All discounts, rebates, or allowances on particular items which are reflected in the amounts shown on the face of the Supplier invoice (referred to as "off-invoice allowances") or designated by the Supplier to be passed on to the Government ~~or to similar commercial customers~~, shall be passed by the Contractor in the form of an up-front price reduction. The total of these discounts, rebates, and allowances (Product Allowance), shall be reflected via a reduced STORES price, resulting in a lower invoice price to the customer. Any rebates that must be passed to the Government and which cannot be applied as an up-front price reduction must be submitted via check made to the US Treasury, attached with itemized listing of all customer purchases by line item to include contract number, call number, purchase order number and CLIN number.

Id. 10/

Finally, section (b)(4) of the EPA clause defines "Distribution Price" as "the firm fixed price portion of the Contract Unit Price, offered as a dollar amount per unit of issue, rounded up or down to the nearest cent." Id. Section (b)(4) also states that "the Distribution Price is *the only method for the Contractor to bill the Government for all costs of contract performance other than Delivered Price; for example, operational costs, overhead and profit*. The Distribution Price shall remain constant for the entire contract period." Id. (emphasis added). Given that this was the particular element of cost/pricing that DLA Troop Support wished to emphasize, the Solicitation later provided further explanation as to what potential offerors should include in the "Distribution Price":

The Distribution Price is the sole compensation to the Contractor for all costs, other than Delivered Price, and anticipated profit related to contract performance. Such costs include, but are not limited to, storage, consolidation, pallets, palletizing, delivery to the customer locations, overhead, and general and administrative expenses.

---

10/ The language stricken purportedly was removed by Amendment 0005. See AR 1130. It should be noted, however, that it was only in Amendment 0007 that DLA Troop Support announced that this language was removed; the court can find no mention whatsoever of section (b)(3) of the EPA clause in Amendment 0005. It appears that by Amendment 0007, DLA Troop Support simply assumed that this language had been deleted, given modifications to the Statement of Work that removed references to "similar commercial customers." In fact, the language of section (b)(3) was never amended officially. Defendant provided the court with a conformed copy of the Solicitation that was amended, and during argument did not disagree that the EPA provision itself had not been conformed.

AR 874.  In essence, to enhance transparency, the Solicitation required all offerors to shift all elements regularly included in Delivered Price to the Distribution Price component so that the Delivered Price represented only the actual cost of the product.  It appears that DLA Troop Support was motivated by the assumption that if it were possible to isolate the actual cost of the product in the Delivered Price category—theoretically, the only element subject to constant market change—far fewer opportunities would present themselves for distributors to inflate the cost to the Government and hide these surcharges under the umbrella of "Delivered Price."  Potential offerors also were required to submit a Distribution Price for each of thirty-eight categories of items, rather than for each individual item in the Solicitation.  See AR 953-54; 1088-91.  Finally, in section (c)(1) the EPA clause explained the process for price adjustments, as such:

> All Contract Unit Prices shall be fixed and remain unchanged until changed pursuant to this clause or other applicable provision of the contract.  Only the Delivered Price component of the Contract Unit Price is subject to adjustment under this clause.

AR 858.

Of particular importance to this protest, DLA Troop Support also attempted to implement a new procedure for dealing with rebates and discounts, elements that often are factored and applied in the prevailing commercial pricing methodologies.  The Solicitation, as amended, included the following "Rebates/Discounts and Price-Related Provisions":

> (a) The contractor shall employ prevailing commercial methods in the pursuit of discounts, rebates, allowances or other similar economic incentives or benefits, for the customers supported under this contract, throughout the period of performance.  *For all items, the contractor warrants, on a continuing basis throughout the period of performance, that its delivered price under this contract is equal to or lower than its delivered price to its commercial customer accounts.*  All NAPA discounts, food show discounts, early payment discounts (except as identified in paragraph (b) herein), and other discounts, rebates, allowances, or other similar economic incentives or benefits received by the Contractor at any time during the period of performance shall be passed to the Government via a reduced catalog price.  Instructions for identifying discounts, rebates, allowances or other similar economic incentives or benefits that shall be provided to the Government or retained by the contractor are set forth in the submission requirements in the Business Proposal/Pricing and in the Reports section of the Statement of Work.

AR 1085 (emphasis added).

As interpreted by DLA Troop Support, the Solicitation required an offeror to accept the responsibility of warranting that the Delivered Price charged to the Government was equal to or lower than the Delivered Price that the offeror passed to any other commercial customer.  Id.; see also AR 1130.  This warranty included prices that were established by agreement between a manufacturer/grower/private label holder and third-party customers—those prices that the distribution offeror took no part in setting and had no control in changing upon delivery of the goods.  In preparing their proposals, offerors thus were required to estimate prices over which they had no control whatsoever and to factor this element into their cost estimates, despite the fact that those costs potentially could change after the contract had been awarded.  11/  Moreover, the Solicitation required that an offeror warrant that the Government, accepting delivery in Texas/New Mexico, receive the lowest price that that distributor offered to any customer anywhere in the world regardless of any naturally occurring regional price differences.  According to this "Most Favored Customer ("MFC") Clause," see, e.g., AR 4243, offerors were required to warrant that they would give the Government the absolute lowest price—regardless of region or bargaining authority—on every item that they delivered.

Of final relevance to this protest, the Solicitation also described the method by which DLA Troop Support would evaluate the pricing in the submitted proposals.  The Solicitation provided:

> Each offeror's total price for evaluation purposes will be calculated by adding the Weighted Aggregate Distribution Price and the Aggregate Delivered Price to arrive at the Weighted Aggregate Unit Price.  The Weighted Aggregate Unit Price will be used to evaluate each offeror's price proposal.
>
> Weighted Aggregate Distribution Price
> Weighted Aggregate Distribution Price is obtained by multiplying each distribution price of each of the items listed in the Market Basket by its estimated quantity, totaling the results for all distribution prices of the items listed in the Market Basket for the base period, and multiplying the aggregate amount by 20 for evaluation purposes.

_____

11/  Although this interpretation is not the only one that this language could bear—nor is it even the most sensical—this interpretation was confirmed by DLA Troop Support in a solicitation question-and-answer session.  See infra (discussing Amendment 0007).  During argument, defense counsel explained that these deviated pricing arrangements were simply a risk that an offeror took in accepting the contract.  See Transcript of Proceedings, U.S. Foodservice, Inc. v. United States, No. 11-376C, at 64 (Fed. Cl. Aug. 17, 2011).

<u>Aggregate Delivered Price</u>
The Aggregate Delivered Price is obtained by multiplying the Delivered Price of each of the items listed in the Market Basket by its estimated quantity, and totaling the results for all Delivered Prices of the items listed in the Market Basket for the base period.

<u>Weighted Aggregate Unit Price</u>
Weighted Aggregate Unit Price is obtained by adding the Weighted Aggregate Distribution Price and the Aggregate Delivered Price for the base period.

For evaluation purposes only, the Distribution Price will be weighted as stated above. The Weighted Aggregate Distribution Prices and Aggregate Delivered Prices will be added to obtain a Weighted Aggregate Unit Price which is the total evaluated price. This evaluated price will be used to determine the lowest overall cost to the Government, and will be used for evaluation purposes only. The weighting factor is applied only to the overall totals, not the individual line item prices.

Even though aggregate prices will be used as the evaluation factor for the Business Proposals, individual line items will be evaluated and individual outliers will be identified and reviewed to determine if offered prices are accurate (for Delivered Price, as compared to the manufacturer/grower's invoice; and for Distribution Price, as compared to the specific Category price offered) and fair and reasonable.

AR 963-64.

Proposal submission initially was to close on November 30, 2010, <u>see</u> AR 826, but the closing date soon proved to be elusive. On November 19, 2010, DLA Troop Support issued Amendment 0001 to extend the closing date to December 14, 2010. <u>See</u> AR 1048-49. Amendment 0001 also added a one-year option period to the Solicitation, slightly modified the Statement of Work (the "SOW"), and supplemented the Solicitation with two FAR clauses: FAR 52.217-9 and FAR 52.222-43. <u>See id.</u> at 1049-50. On December 9, 2010, DLA Troop Support issued Amendment 0002, which extended the closing date to January 14, 2011. <u>See</u> AR 1051-52. On December 17, 2010, DLA Troop Support issued Amendment 0003. <u>See</u> AR 1053-81. This amendment updated several dates in the Solicitation; updated the names of Point of Contact individuals; made revisions to the Distribution Categories, the SOW, and Submission Requirements; and answered some submitted questions about the Solicitation. <u>See id.</u> On January 11, 2011, Amendment 0004 extended the closing date to January 28, 2011. <u>See</u> AR 1082-83.

On January 24, 2011, DLA Troop Support issued Amendment 0005. See AR 1084-1124. This amendment made several additional adjustments to the Solicitation: the contract maximum and the "Rebates/Discounts and Price-Related Provisions" were revised; a reference to the option period was added to the evaluation language found on page 139 of the Solicitation; the Distribution Categories once again were revised; and changes were made to the pricing worksheet. See id. Further, Amendment 0005 revised the evaluation language in an attempt to clarify how the option prices would be evaluated:

> The Distribution Prices for each Market Basket line item will be multiplied by the corresponding base period estimated quantity, summed, and that figure will be multiplied by 20 to arrive at the Aggregate Weighted Distribution Price. The Delivered Prices for each Market Basket line item will be multiplied by the corresponding base period estimated quantity, and summed to arrive at the Aggregate Delivered Price. Both figures will be added together to arrive at the Weighted Aggregate Unit Price for the base period. The same procedure will be used for the option period, using the corresponding option period estimated quantities. Finally, the Weighted Aggregate Unit Prices for the base period and option period will be added together to arrive at the total Aggregate Unit Price for the entire 2 year period, which is the evaluated price.

AR 1091.

On January 26, 2011, Amendment 0006 was issued to extend the closing date to February 3, 2011. AR 1125. Just two days later, on January 28, 2011, DLA issued Amendment 0007, again making changes to the Solicitation. See AR 1126-36. Amendment 0007 revised the pricing definitions, as described above, added reporting requirements for rebates and discounts, stated that references to "manufacturer/grower" would include "private label holder," and provided more answers to questions regarding the terms and requirements of the Solicitation. Id. Numerous questions dealt with the offerors' confusion and concern over the treatment of rebates and the MFC clause. In its answers, rather than attempt a final explanation for how this novel situation would be handled, DLA Troop Support repeatedly pointed to the language of the Solicitation or stated that all references to "same or similar customer" had been deleted; thus, potential offerors were left to infer that DLA Troop Support's stance that "all items . . . [must be] equal to or lower than its delivered price to its commercial customer accounts" comprehended all items, regardless whether an offeror had any control over setting the price, see AR 1130 at Q #2, or whether the Government was similarly situated to a given customer receiving a particular price, see AR 1132 at Q #11; AR 1134 at Q #19. On February 1, 2011, DLA Troop Support issued Amendment 0008, once again extending the closing date—this time to February 9, 2011. See AR 1137-38.

VI.  Protests before the General Accountability Office and subsequent
     DLA Troop Support actions

On February 9, 2011, USF filed a pre-award protest with the Government
Accountability Office (the "GAO") seeking to amend the Solicitation and remove certain
terms, conditions, and evaluation criteria. 12/  See AR 3922-4241.  DLA Troop Support
issued Amendment 0009 on the same date to extend again the closing date of the Solicitation
to February 23, 2011.  See AR 1171.  By February 11, 2011, DLA Troop Support had
received only four proposals in response to the Solicitation; one each from [

].  See AR 4965.  Upon learning of USF's protest to the Solicitation, on
February 14, 2011, both [                              ] requested that DLA Troop Support return
their proposals, see AR 4966-67, which the contracting officer duly accomplished on
February 15, 2011, see AR 4965.  On February 16, 2011, DLA Troop Support issued
Amendment 0010, extending the closing date to March 4, 2011.  See AR 1172.  On March
1, 2011, DLA Troop Support issued Amendment 0011.  See AR 1173-76.  This amendment
removed FAR 52.222-43 from the Solicitation, revised the requirements for each
management report submitted under the contract, clarified the definition of a "private label
holder," added a new exception for private label holders that were affiliates of the Prime
Vendor, and extended the closing date to April 8, 2011.  Id.  On March 8, 2011, [      ]
requested that, in light of the pending protest, its proposal also be returned.  See AR 6269.
This was accomplished on March 30, 2011.  Id. at 6271.

On March 10, 2011, DLA Troop Support executed an addendum to the Class Waiver
for the Inclusion of Provisions/Clauses in Prime Vendor Commercial Acquisitions
Inconsistent with Customary Commercial Practices (the "Addendum") to supplement the
rationale for the existing waiver.  See AR 4242-43.  Of the two supplemental justifications
to the Waiver, the second addressed the "Rebates/Discounts and Price-Related Provisions,"
and once again DLA Troop Support put forth justification for the stringent
Solicitation terms. 13/  See AR 4242-43.  DLA Troop Support does concede that in

--------

12/  There is some discrepancy as to the date on which USF actually filed its protest
before the GAO.  USF's initial motion states that USF filed the protest on February 8, 2011.
See USF's Br. filed July 8, 2011, at 14.  The protest included in the Administrative Record
gives the date of February 9, 2011, see AR 4909, and the GAO decision recites the date as
February 11, 2011, see U.S. Foodservice, Inc., B-404786 et al., 2011 WL 2140485, at *2
(Comp. Gen. May 13, 2011).  The court will rely on the date reflected in the Administrative
Record and assume that USF's protest was filed on February 9, 2011.

13/  The first supplemental justification dealt with the need for a Unilateral Changes
Clause in the contract, a contract term not the subject of the protests.  See AR 4242.  The

customary commercial practice "'most favored customer' warranties (such as warranties that the delivered price is equal or lower than the price given to other customers) *are usually granted to only cover similarly situated customers, for example, based on volume and/or location of sales*." Id. at 4243 (emphasis added). Despite this norm, DLA Troop Support explained that the customized clause in the Solicitation was necessary

> to ensure the delivered price charged to the government . . . only includes the price of product delivered to the initial entry point of the contractor's distribution network. Also, without the warranty that the delivered price under the contract is equal to or lower than the contractor's delivered price to its commercial customer accounts, a contractor is able to compete for award of the contract based on an invoice for the lowest price the contractor gives any of its customers, even if this is not the price that DLA Troop Support will be receiving. Because the delivered price is subject to a fair and reasonable determination rather than competition, DLA Troop Support needs this warranty to give the contractor an incentive to negotiate lower delivered pricing as it does for its other customers.

Id.

On March 11, 2011, DLA Troop Support submitted the Agency Report in USF's GAO protest. See AR 4244-4976. On March 15, 2011, Labatt—plaintiff-intervenor in the pending case—also filed a protest at the GAO to challenge the terms of the Solicitation. 14/ AR 4977-5051. Both USF, see AR 5052-6084, and Labatt, see AR 6085-6093, supplemented their protests in response to the Agency Report.

On April 1, 2011, DLA Troop Support issued the last recorded amendment to the Solicitation—Amendment 0012. AR 1177-90. The amendment made a few minor alterations to the Solicitation, revised some of the submission requirements for private-label holders that were affiliated with the Prime Vendor, and added a last exception to the definition of Delivered Price regarding private-label holders that were affiliated with Prime

---

13/ (Cont'd from page 14.)

court notes DLA Troop Support's remarkable *ipse dixit*: "[I]f a contractor refused to agree to a change in delivery time or place, military customers would not receive food, resulting in mission failure for the Agency." Id.

14/ The GAO appears to have consolidated the two protests and handled them both together. It did not comment on [      ], which technically filed its own comments as an intervenor in the USF protest.

Vendors.  See AR 1178.  Amendment 0012 also included one last Solicitation question-and-answer section to clarify the Solicitation requirements prior to the last date to submit offers, April 8, 2011, which remained unchanged. 15/ [     ] made a resubmission on April 7, 2011,

_____

15/  Why DLA Troop Support included this final question-and-answer section is unclear because, with few exceptions, very little information was actually conveyed in its answers.  The court provides the following as a representative sample of DLA Troop Support's responses:

a.  What is the contract definition of the new term "private label holder"?  Since this term is not defined in the following questions the term "private label entity" is used to mean for purposes of these questions any kind of entity that enters into an agreement to furnish private label items to the contractor (distributor).   Depending on the Government definition of the term private label holder, there may be additional questions based on how that term is used in Amendment 0007.

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [sic] will be addressed during negotiations.

b.  Is the contractor allowed to be an owner of or have any control direct or indirect in the private label holder?

A.  There is no prohibition against this in the solicitation.

c. The change allows the contractor to use the invoice of the private label holder in lieu of an invoice from a manufacturer or grower.  In most private label situations there is a co-package agreement of some kind between a private label entity and the contractor, on one hand and the manufacturer or grower, on the other hand, which actually packages the item.  Is the private label entity and/or the contractor allowed to markup to the Government for any reason the price paid by the private label entity/contractor to the manufacturer/grower for the time that is packaged by the manufacturer/grower under the co-package agreement?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [sic] will be addressed during negotiations.

d.  Typically in a private label arrangement there is money flowing back from

_____

15/  (Cont'd from page 16.)

the private label entity to the contractor/distributor.  Under whatever name is used for this "flow back money" is the contractor allowed to retain such money flowing from the private label entity to the contractor?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [*sic*] will be addressed during negotiations.

e.  By adding the term "private label holder" you appear to be making a private label holder equivalent to manufacturer or grower.  Does that mean that you will accept an invoice for distribution price from a private label holder in lieu of a manufacturer or grower?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [*sic*] will be addressed during negotiations.

f.  If a manufacturer or grower gives a rebate, discount, or allowance to a contractor you have stated that this must be "passed" to the government.  Does the appearance of the term private label holder mean that if a manufacturer or grower gives a rebate to a private label holder but not directly to the contractor, the contractor is not obligated to pass this rebate, discount or allowance to the government?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [*sic*] will be addressed during negotiations.

g.  Why would a private label holder invoice qualify as a delivered price, and supersede the invoice of the manufacturer or grower?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [*sic*] will be addressed during negotiations.

. . . .

a.  What is the contract definition of a "redistributor"?

17

and [      ] resubmitted its proposal on April 8, 2011.  See AR 6289.  When the proposal period on the Solicitation finally ended, DLA Troop Support had received three offers, although none of them conformed to the requirements of the Solicitation.  See AR 6297-99.

Commencing on May 10, 2011, and continuing through May 31, 2011, DLA Troop Support issued fourteen additional identical solicitations covering different geographic areas of the CONUS.  See generally AR 1191-3918.  On May 13, 2011, the GAO summarily denied the protests of USF and Labatt.  See U.S. Foodservice, Inc., B-404786 et al., 2011 WL 2140485, at *1 (Comp. Gen. May 13, 2011).  The GAO determined that all of USF's and Labatt's arguments were derivative of a simpler, overarching disagreement with DLA Troop Support's decision to deviate from customary commercial practice.  See id. at *4.  The GAO found that the Waiver and Addendum executed by DLA Troop Support were executed properly and were sufficiently reasonable to deviate from the commercial practices endorsed by the food-service distribution industry.  See id.  The GAO concluded that it was reasonable for DLA Troop Support to adopt pricing provisions to combat excessive charges and to ensure pricing transparency and integrity.  See id.  The GAO also summarily rejected the

---

15/  (Cont'd from page 17.)

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [sic] will be addressed during negotiations.

b.  How does a redistributor differ from the private label holder or the contractor.

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [sic] will be addressed during negotiations.

c.  By their nature private label entities do not have published prices, since private label production is always a negotiated price between the contractor and the copacker.  How then would a redistributor be able to use its "price" in lieu of the invoice of a manufacturer/grower/private label holder under subparagraph (a)?

A.  We believe the term/statement is self explanatory but if there are any discrepancies in how offerors are interpreting the term, it [sic] will be addressed during negotiations.

AR 1182-84.

protesters' arguments that the Solicitation was unreasonable, overly onerous, or ambiguous. See id. at *4-*6.

By letter dated June 2, 2011, DLA reopened negotiations with the three remaining offerors: [                           ].  See AR 6297-99.  The form letter advised each offeror that its proposal as originally submitted contained exceptions to the Solicitation provisions and was not acceptable.  See id.  All three were invited to submit revised price proposals if their exceptions were withdrawn.  See id.  [      ] responded by letter on June 8, 2011, requesting clarification of DLA Troop Support's reading of its proposal; [      ] was unaware that it had taken exception to any Solicitation requirement and requested further information.  See AR 6300.  [           ] also responded by letter on June 8, 2011, stating that it would be unable to comply with the Solicitation requirements.  [          ] focused in particular on the MFC clause that imposed requirements "completely outside the control of [          ] and [which] could impose legal liability on [        ]." 16/  AR 6301. Indeed, [            ] transmitted a wholesale revision of the MFC clause.  See AR 6305. [     ] did not respond.

V.  Procedural history

On June 10, 2011, USF filed its protest before the United States Court of Federal Claims, and an agreed-upon briefing schedule was entered on June 13, 2011.  See Order entered June 13, 2011.  Also on June 13, 2011, Labatt filed a motion to intervene, which defendant opposed.  The Administrative Record was filed on June 21, 2011.  On June 24, 2011, the court granted Labatt's motion to intervene and required the filing of its complaint by June 30.  See Order dated June 24, 2011.  Labatt filed its complaint on June 30, 2011.  On July 8, 2011, USF filed a Motion for Judgment on the Administrative Record and Request for Permanent Injunctive Relief.  Labatt filed its Motion for Judgment on the Administrative Record on July 12, 2011.  Defendant responded separately to both motions and filed a joint Motion for Judgment on the Administrative Record on July 29, 2011.  On August 5, 2011, both USF and Labatt filed their responses.  Defendant filed a consolidated reply on August 12, 2011.

---

16/ Rather than conform its proposal to the MFC clause contained in the Solicitation, [      ] actually proposed numerous revisions that DLA Troop Support could make that would render the Solicitation requirements acceptable.  See AR 6305.

## DISCUSSION

I. <u>Plaintiffs' standing and ripeness of challenge to the Solicitation</u>

As a threshold matter, to have standing to bring a protest action, the protester must demonstrate that it is an "interested party objecting to a solicitation by a Federal Agency." 28 U.S.C. § 1491(b)(1) (2006). To satisfy this standard, the "interested party" must show that it is (1) "'an actual or prospective bidder[] or offeror[;]'" and (2) its "'direct economic interest [is] affected by the award of the contract or by failure to award the contract.'" <u>Rex Serv. Corp. v. United States</u>, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (quoting <u>Am. Fed'n of Gov't Emps. v. United States</u>, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (adopting language of the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A) (2006))). It is undisputed that both USF and Labatt are "interested parties" under this standard.

However, defendant does dispute that plaintiffs' claims are ripe for adjudication. <u>See</u> Def.'s Br. filed July 29, 2011, No. 39, at 20. Defendant argues that, because all offerors took exception to the Solicitation's pricing provisions, DLA Troop Support was required to open negotiations with the offerors, thereby rendering uncertain the final pricing provisions of the Solicitation. <u>See</u> <u>id.</u> Defendant thus contends that this uncertainty enlists this court in premature intervention and potentially places it in position to issue an advisory opinion.

Defendant is not abiding by the precedents to which its argument refers. The U.S. Supreme Court has stated that a claim is not ripe for adjudication where it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>Thomas v. Union Carbide Agric. Prods. Co.</u>, 473 U.S. 568, 580-81 (1985) (citation omitted). Thus, the court should take into account two factors when determining whether an agency action is ripe for review: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 149 (1967). The United States Court of Appeals for the Federal Circuit has stated that, under the first factor, an action is not final until the agency has adopted a final decision—one that (1) "marks 'the consummation of the agency's decision making process[,]'" and (2) "the action [is] one . . . from which legal consequences will flow." <u>NSK Ltd. v. United States</u>, 510 F.3d 1375, 1384 (Fed. Cir. 2007).

This proceeding reflects a final agency action. The deadline for submitting proposals on the Solicitation finally occurred on April 8, 2011. <u>See</u> AR 1178. It is abundantly clear that DLA Troop Support knew how to modify the terms of the Solicitation, but as of April 8, 2011, DLA Troop Support had decided the terms of the Solicitation were no longer subject to substantive revisions, and potential offerors either had to accept DLA Troop Support's requirements as they stood or not propose on the Solicitation. <u>See</u> AR 6297-99. After the deadline for proposals, DLA Troop Support could no longer make any modifications to the

20

terms of the Solicitation.  Although defendant has argued that DLA Troop Support is in negotiations with the three remaining offerors, the record demonstrates that none of them responded affirmatively to the request to negotiate nor did any of them submit conforming proposals.

Defendant also argues that, because a contract has not been awarded, the terms are necessarily uncertain and no final agency action presents itself for review.  See Def.'s Br. filed July 29, 2011, No. 39, at 20.  However, this argument would frustrate all pre-award bid protests, which, by definition, must be brought prior to the award of the contract.  The law is to the contrary.  In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007), the Federal Circuit established a waiver rule in respect of pre-award protests. In the interests of fairness and expense, the Federal Circuit ruled that a party must challenge an alleged impropriety in a solicitation before the close of the submittal process.  "Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm." Id. at 1314.  By bringing their challenge prior to award of the contract, plaintiffs have complied with this rule and avoided the likelihood that the challenge to the Solicitation would be deemed untimely if filed subsequent to award.  Denying plaintiffs review of their complaints effectively would preclude review of any challenge to the terms of this Solicitation.  Plaintiffs' claims are ripe for adjudication.

II.  Standards

1.  Standard of review in bid protest actions

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests. See Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi").  The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA").  See 28 U.S.C. § 1491(b)(4).  The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions); see also Domenico Garufi, 238 F.3d at 1332-33 (making applicable the standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny to bid protests).

Accordingly, as recently restated by the Federal Circuit, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law. 17/ Id.; see Banknote Corp., 365 F.3d at 1351; Domenico Garufi, 238 F.3d at 1333; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 8 (2005). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. Domenico Garufi, 238 F.3d at 1333.

A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion." Id. (citation omitted) (internal quotation marks omitted). The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute its judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (stating a court should not "substitute its judgment for that of the agency"), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008); Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (holding that courts should review agency record to determine if agency's decision is supported by a rational basis). An agency's decision will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); Lumetra v. United States, 84 Fed. Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))).

Instead, under the "highly deferential rational basis review," Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting CHE Consulting, 552 F.3d at 1354) (internal quotation marks omitted), the court "must sustain an agency action unless the action does not 'evince[] rational reasoning and consideration of relevant factors,'" id. (alteration in original) (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). A court should only find an agency's decision to be arbitrary

---

17/ This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. See Domenico Garufi, 238 F.3d at 1335.

and capricious—thus lacking a rational basis—if the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.'" Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

### 2. Standard of review for judgment on the administrative record

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1. This rule provides a procedure allowing the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." Bannum, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. at 1355-56.

### 3. Standard of review for injunctive relief

Plaintiffs seek an injunction enjoining DLA Troop Support from proceeding with the terms of the current Solicitation. The Federal Circuit has described injunctive relief as "extraordinary relief." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983). Adoption of the APA substantive standard of review did not change the court's standard for granting injunctive relief. See PGBA, 389 F.3d at 1224-28 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). In order to obtain an injunction, the Federal Circuit requires a protester to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009). But, "[n]o one factor, taken individually, is necessarily dispositive[,]" FMC Corp, 3 F.3d at 427, and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial," Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990). But success on the merits has previously been held to be the most important factor for a court to consider when considering whether to issue injunctive relief. See Blue & Gold Fleet, 492 F.3d at 1312.

## III. Plaintiffs' challenges to the Class Waiver and the Solicitation

Plaintiffs' protests level an array of challenges that the terms of the Solicitation are arbitrary and capricious. At the heart of their protests is plaintiffs' objection to the

Solicitation's pricing scheme—in particular, the calculation of Distribution and Delivered Prices and the related warranty requirement that all rebates, discounts, allowances, and other forms of profit and mark-ups are to be passed on to the agency or are to be included in the fixed-price provisions of the Distribution Price. Plaintiffs strenuously argue that DLA Troop Support's departure from the customary commercial practices in this area was unnecessary and unjustified.

Plaintiffs broadly assert that the Class Waiver fails the requirements of FAR 12.302(c) and that the weighted price evaluation scheme is arbitrary and capricious. Plaintiffs also attack more specifically as arbitrary and capricious the Rebates/Discounts and Price-Related Provisions clause of the Solicitation. They assert that the new definition of Delivered Price and the corresponding requirement that supply chain investments, earned income, and freight income be recovered in the Distribution Price; the MFC warranty; and the improper imposition of cost-type contracting and accounting requirements on commercial distributors are unreasonable requirements and the products of arbitrary agency action.

Defendant counters that the Class Waiver was executed in conformity with FAR requirements for the terms that are inconsistent with commercial practices. See Def.'s Br. filed July 29, 2011, No. 39, at 20-21. Further, defendant maintains that the Class Waiver, the tailored economic-price-adjustment provisions, the revisions to the Rebates/Discounts and Price-Related Provisions clause, and the weighted price evaluation are not arbitrary and capricious because they are justified by the agency's need to combat fraud and the need for price transparency in DLA Troop Support's food-distribution procurements—both reasonable goals whose method of implementation is deserving of deference by this court. See id. at 23-25, 27-28, 30, 32, 34-39.

As evidenced by the voluminous Administrative Record and the lengthy recital of facts set forth above, this was a long, drawn-out procurement that was fraught with complications. The protracted solicitation period and the numerous amendments that constantly—and unevenly—modified the Solicitation gives the plaintiffs numerous developments to mine in attempting to enjoin the Solicitation. This court will not address every argument that plaintiffs have put forth; instead, this court focuses only on those issues that are dispositive of the requirement that plaintiffs succeed on the merits of their challenge. Having done so, this court finds that DLA Troop Support did set forth an adequate and reasonable basis in executing its Class Waiver to depart from the customary practices of the food-service distribution industry. But, when examining for reasonableness the methodology substituted for the displaced commercial practices, this court finds that the MFC clause crafted by DLA Troop Support exceeds the bounds of rationality and amounts to an arbitrary and capricious requirement foisted on potential offerors. Given that the mandates of this particular clause pervade all aspects of pricing under the Solicitation, plaintiffs have succeeded on the merits of their challenge to the Solicitation.

1.  The Class Waiver and Addendum

Central to plaintiffs' protest is their charge that much of the Solicitation's revised terms and conditions are deviations from standard commercial practices in the food-service distribution industry.  Plaintiffs argue that, although the Waiver and Addendum and supplement were executed following the proper procedures, the justifications appearing therein do not support these deviations from customary commercial practice because the justifications are either unreasonable or are insufficient to establish the need to depart from the commercial practices.  Based on the most applicable Federal Circuit precedent dealing with the "reasonableness" of agency justifications to changes in procurement schemes, this court rules that plaintiffs' challenges to the Class Waiver lack merit.

FAR 12.301(a) provides that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses—(1) Required to implement provisions of law or executive orders applicable to the acquisition of commercial items; or (2) Determined to be consistent with customary commercial practice." FAR 12.301(a) (2011).  FAR 12.302, titled "Tailoring of provisions and clauses for the acquisition of commercial items," begins, as follows:

> The provisions and clauses established in this subpart are intended to address, to the maximum extent practicable, commercial market practices for a wide range of potential Government acquisitions of commercial items.  However, because of the broad range of commercial items acquired by the Government, variations in commercial practices, and the relative volume of the Government's acquisitions in the specific market, contracting officers may, within the limitations of this subpart, and after conducting appropriate market research, tailor the provision at 52.212–1, Instructions to Offerors-Commercial Items, and the clause at 52.212–4, Contract Terms and Conditions–Commercial Items, to adapt to the market conditions for each acquisition.

FAR 12.302(a). 18/  More generally, FAR 12.302(c) further addresses the possibility of tailoring other contract provisions that are inconsistent with customary commercial practices:

_____

18/ FAR 12.302(a) is applicable to the Addendum, executed March 10, 2011, because it purports to justify a modification to FAR 52.212-4(c) Changes Clause.  As such, the requirement of sufficient market research is triggered.  Although the exact extent of market research that DLA Troop Support performed to justify its modifications to the Changes Clause is unclear, neither USF nor Labatt took issue with this particular aspect of the Class Waiver.  Therefore, further exploration of the requirements imposed by FAR 12.302(a) in this case is unnecessary.

The contracting officer shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures.  The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government.  A waiver may be requested for an individual or class of contracts for that specific item.

FAR 12.302(c).  Unlike the scope of FAR 12.302(a), this provision does not apply to specific clauses in the contract, but instructs that, absent a waiver,  the contracting officer cannot tailor "any clause" or add "any additional terms or conditions."  Id.  Additionally, contrary to Labatt's reading, see Labatt's Brief, filed July 12, 2011, at 11-13, FAR 12.302(c) does not require the contracting officer to perform market research as a precondition to tailoring terms other than those listed in FAR 12.301(a) that depart from customary commercial practices. All that is required is that a "waiver [be] approved in accordance with agency procedures." FAR 12.302(c).

Plaintiffs do not contend that either the Class Waiver or the Addendum was executed improperly.  Plaintiffs' challenges implicate the reasons set forth by DLA Troop Support justifying the need to depart from the standard practices in the food-service distribution industry.  It is on these issues that the court focuses its attention.  Unfortunately, as evidenced by the parties' briefs, a notable lack of case law exists on waivers executed pursuant to FAR 12.302(c).  Citing the GAO's decisions in PWC Logistics Servs. Co., B-400660, 2009 WL 920036 (Comp. Gen. Jan. 6, 2009), and Aalco Forwarding, Inc., B-277241 et al., 1997 WL 649182 (Comp. Gen. Oct. 21, 1997), defendant urges that challenges to the validity of waivers be reviewed under a reasonableness standard.  Def.'s Br. filed July 29, 2011, No. 39, at 22; cf. ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 406 (2003) (while not reaching question of reasonableness of agency waiver under FAR 12.302(c), Court of Federal Claims will look to GAO decisions for guidance in determining ancillary issue of whether waiver should be obtained before solicitation issues).  Labatt, too, agrees that the test of the validity of a waiver executed pursuant to FAR 12.302(c) is one of reasonableness.  Labatt's Br. filed Aug. 5, 2011, at 4.  Because the reasonableness standard is the one applied by the Federal Circuit in the two cases that most correspond to the present action, and this court's task in bid protest actions is only to review agency action for a rational basis, see Camp, 411 U.S. at 142-43, this court concurs that DLA Troop Support's execution of the Class Waiver is subject to a reasonableness review.

As with the instant solicitation, CHE Consulting, 552 F.3d 1351, and Weeks Marine, Inc. v. United States, 575 F.3d 1352 (Fed. Cir. 2009), involved challenges to modified procurement schemes and are relevant to determining whether the Government had a rational basis both for issuing the waiver and for the modifications to specific clauses. Both cases involved challenges to solicitations that departed from the practices that the Government had been using in the relevant fields. Although the pending Solicitation is challenged on a departure from customary commercial practices, because those customary practices were ones that DLA Troop Support had used in previous food-service distribution contracts, see, e.g., USF's Br. filed July 8, 2011, at 10, the Solicitation can also be evaluated as one in which the Government has attempted to deviate from prior procurement methods in an effort to meet its changing needs.

In CHE Consulting the United States Naval Oceanic Office ("NAVO") issued a solicitation calling for a "single provider" for hardware and software support of a "complex computer system." 552 F.3d at 1352. The computer system at issue was the Department of Defense's Major Shared Resource Center ("MSRC"), which "acquire[d] and analyze[d] worldwide oceanic and shoreline data" that provided support for weapons programs, several thousand security experts, and civilian scientists. Id. Due to the importance of the MSRC computer system, NAVO required maintenance of both system hardware and software from vendors that were required to provide twenty-four hour-service support, seven days a week, with a two-hour response time in order to ensure at least a 97% availability rate for all users of the MSRC. Id. Because the software was the intellectual property of Storage Technology Corporation, that company provided the software support. The General Service Administration ("GSA") originally issued a single solicitation for hardware and software maintenance support from a single vendor. Id. at 1352-53.

At the request of CHE Consulting, in order to "allow full and open competition," GSA divided the procurement into two solicitations, one for hardware maintenance, to which CHE Consulting submitted a bid, and another for software maintenance. Id. at 1353. However, NAVO stated that "it would not accept de-bundled proposals"—only proposals from single-service providers. Id. An e-mail memorandum from NAVO's representative explained that "multiple providers could not meet the MSRC's operational needs because separate hardware and software maintenance providers could disrupt mission-critical service and maintenance response time." Id. GSA then cancelled the solicitation, and re-issued a solicitation requiring a single-service provider for both hardware and software support. Id. CHE Consulting filed an agency-level protest citing seven examples of other agencies separating out the software and hardware maintenance requirements. Id. NAVO responded with an affidavit explaining that the "complexity and importance of this library system, the risk of potential disputes between multiple maintenance providers in the event of a failure, and the great cost of system downtime" justified its decision to bundle the hardware and software

maintenance procurements.  Id.  GSA determined this constituted a reasonable basis for NAVO's need to bundle the solicitations.  See id.

CHE Consulting then protested the revised solicitation in the Court of Federal Claims, requesting that NAVO be enjoined from issuing a solicitation bundling both services.  Id. CHE Consulting argued that NAVO's contract bundling requirement lacked a rational basis because the agency's proffered rationale that "de-bundling the contract would result in finger-pointing and unnecessary downtime were conclusory in nature without any support in the record."  Id.  Based upon the initial administrative record alone, the Federal Circuit disagreed, holding that NAVO had established a rational basis for its actions. 19/ See id. at 1354.

The Federal Circuit looked to several documents from the contracting officer's representative (the "COR") that were in the pre-supplemented record in finding that NAVO had established a rational justification for the agency's actions.  Id. at 1354-55.  The COR's memorandum, dated September 28, 2006, which "laid a framework for the agency's rational basis," articulated several concerns that dividing the service contracts would "present unacceptable risks to mission-critical equipment" given that "[a]ny disruption in service can ripple through the center with adverse effects" and that a multi-vendor contract would make it "extremely difficult if not impossible" to keep the equipment functioning properly.  Id. at 1354.  The COR's affidavit—submitted in response to the agency-level protest—stated "in great detail, particulars about the MSRC's mission critical operations, which relate to a broad swath of national security interests" which the Federal Circuit found to build on the agency's reasoning.  Id.  Lastly, the Federal Circuit looked to a legal memorandum from the agency, also dated December 18, 2006, that explained the cascading effect that "each wall clock hour of downtime incurred" has on the MSRC users, who experience "many thousands of processor hours of down time."  Id. at 1355 (citation omitted).

---

19/  The trial court had suggested that NAVO supplement the administrative record in order to provide more justification for its "string of conclusory type statements."  CHE Consulting, 552 F.3d at 1353.  After NAVO complied, the trial court held in favor of the Government, finding that the market and cost analysis NAVO submitted to supplement the record were consistent with NAVO's concerns about the risk and costs of downtime versus cost savings from using two maintenance providers.  Id. at 1353-54.  On appeal, however, the Federal Circuit stated that this supplementation was unnecessary and based its ruling only on the initial record before the trial court.  Id. at 1354 ("Upon review of the entire record, this court determines that NAVO had established a rational basis to combine hardware and software maintenance services into one contract before the trial court requested supplementation.  The additions to the administrative record were thus not necessary.").

The appeals court held that these three documents voiced sufficient concerns to provide a rational basis for the bundled procurement, even though they could be fairly classified as mere conclusory statements. See id. Indeed, the Federal Circuit explained that NAVO's concerns required no further substantiation in order to justify a change in the procurement scheme:

> NAVO has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review. Moreover [the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A) (2006)] imposes no obligation to supply a historical record of failures in order to substantiate a risk. Indeed NAVO has a responsibility to assess risks and avoid them before they become a historical fact. . . . In terms of this procurement, NAVO need not suffer some maintenance failures in order to substantiate its assessment of risks . . . . Thus, to satisfy its obligation to supply a rational basis for its decisions, NAVO may supply a reasoned chronicle of its risk assessment, as it did in this case.

Id. Accordingly, because "NAVO showed that undivided maintenance service is rationally related to critical mission needs, especially where the software and hardware aspects of the system are highly complex and tightly integrated," it had "articulated a sound reason for its procurement decision, and this court sees no reason to disturb it." Id at 1356.

One year later in Weeks Marine, the Federal Circuit continued this deferential reasonableness approach to changes in procurement schemes and reversed entry of a permanent injunction against the U.S. Army Corps of Engineers (the "Corps"). 575 F.3d at 1354. The trial court held that the procurement lacked a rational basis and sustained the pre-award bid protest of a solicitation for indefinite duration-indefinite quantity ("IDIQ") multiple-award task order contracts ("MATOCs") for dredging and shore protection work in the Corps's South Atlantic Division. See id. at 1354-55. The Corps's prior procurements in its South Atlantic Division were awarded pursuant to competitive sealed bidding "solely on the basis of price and price-related factors." Id. at 1355. The challenged procurement deviated from this practice by using negotiated bidding and the award to multiple contractors of IDIQ MATOCs. Id. The Corps drafted an Acquisition Plan justifying the decision to change procurement methods and detailing the new procurement plan. Id. As with CHE Consulting, the challenged procurement scheme in Weeks Marine constituted a "significant departure from current" agency practices. Id.

The trial court rejected each of the Corps' seven proffered justifications, holding that the new procurement scheme lacked a rational basis. See id. at 1357. On appeal the Corps again argued that the same seven reasons justified the new procurement scheme and that the Acquisition Plan provided a detailed rationale for each reason. See id. at 1369-70 ("As seen, through the use of IDIQ MATOCs, the Corps expects to (1) obtain qualified contractors; (2)

reduce procurement time; (3) realize savings in administrative costs; (4) reduce or eliminate the need for emergency procurements; (5) allow for greater coordination between the districts in the South Atlantic Division; (6) facilitate the use of small businesses; and (7) be able to address national security needs through more timely execution of dredging near military bases."). Weeks argued that the Corps did not meet its burden to show that the IDIQ MATOCs were necessary to achieve the Corps's stated objectives and that the solicitation and Acquisition Plan did not provide sufficient empirical evidence linking the Corps's needs to the new procurement scheme. Id. at 1369.

The Federal Circuit was not persuaded by Weeks's arguments. Explaining that the court's opinion in CHE Consulting "controls this case," the court held that the Corps had a rational basis for changing the procurement scheme and upheld the solicitation. See id. at 1370. The court explained that the Corps "put forth seven specific reasons for its procurement action, each of which represents a legitimate procurement objective. And as seen, in the case of each reason, the Acquisition Plan states the underlying rationale." Id. Based upon its seven reasons and underlying rationale, the Corps satisfied CHE Consulting's requirement that it "'supply a reasoned chronicle of its risk assessment,'" id. at 1370 (quoting CHE Consulting, 552 F.3d at 1355), by "stating the reasons for its procurement decision and the thinking behind those reasons," Id. The Federal Circuit refused to impose the burden argued for by Weeks that the Corps be required to show that the procurement changes were necessary to achieve its objectives and did not find problematic that the Corps had not provided any empirical evidence to support the notion that the new procurement scheme would help them better meet their stated objectives.

Guided by the holdings in CHE Consulting and Weeks Marine, this court now examines whether DLA Troop Support supplied "a reasoned chronicle of [the] risk assessment . . . by stating the reasons for its procurement decision and the thinking behind those reasons" to justify a departure from the customary commercial practices in the food-service distribution industry—the root of plaintiffs' challenge to the Solicitation. Id. Looking first to the Class Waiver itself, DLA Troop Support first explains the need for the economic price adjustment clause, as follows:

> It would not be practical or possible to adjust the prices of food service delivery suppliers in a changing marketplace via the use of a single index. Further, it would not be possible for DLA TROOP SUPPORT contracting personnel to establish the fairness and reasonability [sic] of prices under contracts without the use of this unique EPA clause.

AR 63-64. With respect to the Rebates/Discounts, and Price-Related Provisions, the initial Class Waiver explains:

> DLA seeks to avoid excessive pass through charges from multiple sources along the supply chain . . . to protect the taxpayer. Therefore the rebates/discounts and price related provisions definition is designed *to promote pricing transparency* and *place integrity into the commercial pricing process*. This is achieved by requiring the prime vendor to provide proof of the delivered price portion of the unit price via invoice documentation of FOB origin/point of manufacture, documentation of discounts, rebates, allowances or other similar economic incentives, and other supporting documentation as needed.

AR 65 (emphasis added). The Addendum further elaborates that "[t]hese provisions are necessary to ensure the delivered price charged to the government, which is subject to the EPA clause, only includes the price of product delivered to the initial entry point of the contractor's distribution network." AR 4243.

The need for the warranty provision requiring that the contract's Delivered Price be equal to or lower than the price given to the contractor's commercial accounts is explained, as follows:

> [A] contractor is able to compete for award of the contract based on an invoice for the lowest price the contractor gives any of its customers, even if this is not the price that DLA Troop Support will be receiving. Because the delivered price is subject to a fair and reasonable determination rather than competition, DLA Troop Support needs this warranty to give the contractor an incentive to negotiate lower delivered pricing as it does for its other customers.

Id.

Defendant submits that the reasons offered by DLA Troop Support meet the reasonableness standard. Defendant reiterates that fraud "is a very real" issue for DLA Troop Support. Def.'s Br. filed July 29, 2011, No. 40, at 23-24 ("The proposed pricing terms in the solicitation are intended to allow DLA Troop Support better ability to provide oversight to contracts and to respond to the Inspector General's criticism."). For support defendant points to a report from the Department of Defense Inspector General that pertains to DLA Troop Support's supervisory performance over an OCONUS (Outside Continental United States) food-service contract. 20/ Id. at 24; see also AR 4280. Defendant reiterates

---

20/ This Inspector General report is of limited relevance. See AR 5171-5224. This report covers the procurement problems experienced under a food-service contract dealing with Afghanistan. Whatever problems DLA Troop Support may have experienced in supervising that OCONUS war-time procurement do not bear any similarities to a domestic

that the Inspector General's report "specifically found that DLA Troop Support 'did not provide sufficient oversight of contract costs and performance' regarding a major contract." Def.'s Br. filed July 29, 2011, No. 39, at 24 (quoting AR 4280).  The challenged pricing terms are a direct response to the Inspector General's criticism and are "intended to allow DLA Troop Support better ability to provide oversight to contracts."  Id.

This court agrees with defendant that the justifications proffered by DLA Troop Support are sufficient to meet a reasonableness review and justify the Class Waiver.  To borrow from Weeks Marine, this court "think[s] it can hardly be argued" that attempting to increase the transparency of the procurement process to cut down on incidents of fraud is "not a legitimate procurement objective."  Weeks Marine, 575 F.3d at 1396.  Although USF's argument that merely citing the possibility of fraud in the procurement process as sufficient to depart from commercial practices seems to negate much of the force behind FAR 12.302 because fraud is always a possibility in government procurement, see USF's Br. filed July 8, 2011, at 42, this court cannot conclude that revising the procedures to decrease the incidence of fraud is unreasonable.  It would be inappropriate—particularly, in the current fiscal situation—for this court to attempt to hinder the Government from trying new methods to reduce fraud and save the taxpayer money and inappropriate, as well, for the court to foist its own views on the Government of the best practices to employ.  DLA Troop Support has been the victim of fraud in food-service distribution contracts, and its attempts to cut down on potential fraud by increasing the transparency of the acquisition process is a reasonable objective for a government agency to pursue.

Moreover, Weeks Marine and CHE Consulting counsel against finding the Waiver lacking based on the argument that current procurement practices are sufficient to meet the agency's needs.  USF argues that the inquiry is not whether DLA Troop Support's explanation is reasonable, but, rather, that DLA Troop Support must demonstrate a need or requirement to use the terms set forth in the waiver.  See USF's Br. filed Aug. 5, 2011, at 29.  The inference drawn from USF's argument is that, if agency needs can already be met under the existing procurement regime, then any departure or supplementation by the agency is ipso facto irrational.  This is incorrect.  First, this inference is not supported by case law.  Together, CHE Consulting and Weeks Marine establish that, so long as the agency has sufficient reasons supporting the novel procurement actions it takes, that is all that is required

_____

20/ (Cont'd from page 31.)

CONUS procurement, and the factual situations are so completely different that the court is skeptical that lessons learned by DLA Troop Support in that particular procurement are transferable to the current procurement.  Therefore, the court draws on this report only insofar as it is an example of the potential for fraud in food-service distribution contracts—nothing more.

to pass a reasonableness review.  DLA Troop Support is not obligated to demonstrate an immediate need, nor must it produce sufficient research and analysis to substantiate that the new procurement practices will achieve the agency's stated goals.  See, e.g., Weeks Marine, 575 F.3d at 1369.

Second, this inference is based to a great extent on perspective.  DLA Troop Support is not required to find that the old system is completely unable to meet its procurement objectives.  While the procedures currently in place might be sufficient to combat fraud, it is within DLA Troop Support's purview to find them inadequate to the task in practice.  Further, given the examples of past fraud that DLA Troop Support has been able to identify, this court cannot say that its position is unjustified.  Third, this all-or-nothing approach to modifying procurement practices is not conducive to judicial resolution because it would engender the inevitable questions of how to calibrate the showing required to demonstrate an inadequate procurement procedure.  This kind of line-drawing problem has been remitted to the discretion of the agency, not the court.

Further, the agency need not proffer specific instances of "past experiences substantiating its concerns in order to survive rationale basis review." CHE Consulting, 575 F.3d at 1355.   The clear message from CHE Consulting is that agencies need not only be reactive to procurement problems. See id.  Instead, courts should allow agencies the freedom to shape the procurement process to address potential problems before they arise.  Forcing DLA Troop Support to wait until it has been swindled before allowing it to take action to protect the taxpayers is not a reasonable—or, to this court, a palatable—position.  If the agency has made a determination that, while the old system is not ineffective, a potentially better way of doing business should be attempted, the court is not in a position to restrain it from acting in the pursuit of this reasonable goal.

DLA Troop Support concluded that combating procurement fraud, increasing pricing transparency, and injecting integrity into its commercial pricing practices justify issuance of the waiver.  These are defensible grounds that are sufficient to satisfy a reasonableness inquiry.  Accordingly, this court finds that DLA Troop Support did provide sufficient justification for issuing the Waiver and Addendum and for departing from the customary commercial practices of the food-service distribution industry.

2. The MFC clause

It is not just the Class Waiver, but the methods adopted by DLA Troop Support to implement the Waiver that are challenged as unreasonable.  This court agrees with the GAO that many of plaintiffs' arguments are rooted in simple disagreements with DLA Troop Support's decision to depart from the commercial pricing customs of the industry. See U.S. Foodservice, Inc., B-404786 et al., 2011 WL 2140485, at *4 (Comp. Gen. May 13, 2011).

These arguments fail in light of the above discussion.  Unlike the GAO, however, whose cursory opinion seemed to take for granted that once DLA Troop Support had established that it was reasonable to depart from customary commercial practices, any methodology then implemented was itself reasonable, see id. at *4-*6, this court takes the view that the actual procedures implemented by the agency in place of the deemed inadequate commercial practices must also be reasonable in-and-of themselves.

Under the standard established by CHE Consulting and Weeks Marine, the agency must articulate "a reasoned chronicle of [the] risk assessment . . . by stating the reasons for its procurement decision and the thinking behind those reasons."  Weeks Marine, 575 F.3d at 1370 (citation omitted).  DLA Troop Support has listed the reasons for its methodology decisions in the Waiver and the Addendum.  See AR 63-67; 4242-43.  However, if in examining those reasons, the court is persuaded that the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,'"Ala. Aircraft Indus., 586 F.3d at 1375 (alteration in original) (quoting Motor Vehicle Mfrs., 463 U.S. at 43), then it is bound to hold that specific methodological decision irrational.

In this case, although DLA Troop Support established that its decision to depart from customary commercial practices was reasonable, this court finds that the inclusion of this particular MFC clause is an irrational and unreasonable attempt towards pursuing its overall goals of increasing transparency and reducing fraud.  Simply put, the explanation provided to justify this particular clause is so implausible and disconnected from what the MFC clause actually requires as to be irrational.

The Solicitation, as amended, includes the following MFC clause, which provides, in pertinent part:

> For all items, the contractor warrants, on a continuing basis throughout the period of performance, that its delivered price under this contract is equal to or lower than its delivered price to its commercial customer accounts.

AR 1085.  The Addendum offered the following rationale for this requirement:

> [W]ithout the warranty that the delivered price under the contract is equal to or lower than the contractor's delivered price to its commercial customer accounts, a contractor is able to compete for award of the contract based on an invoice for the lowest price the contractor gives any of its customers, even if this is not the price that DLA Troop Support will be receiving.  Because the delivered price is subject to a fair and reasonable determination rather than

competition, DLA Troop Support needs this warranty to give the contractor an incentive to negotiate lower delivered pricing as it does for its other customers.

AR 4243.

In its opening brief, USF offered some context for the inclusion of a MFC clause. According to USF, in the food-service industry MFC pricing is normally

limited to customers that are *similarly situated* (e.g., same geographic region and same purchase quantities and without accounting for deviated pricing negotiated by certain customers directly with manufacturers).

USF's Br. filed July 8, 2011, at 25 (emphasis added). The Solicitation's MFC clause represents a substantial departure from the industry standards because "no similarly situated restriction" is included. The MFC clause in the Solicitation is unique in that it enables the Government to "receive the best delivered price for any product sold to any customer anywhere in the world, regardless of the circumstances of the sale"; in other words, regardless of regional, freight, and market price variances. Id. Of far more significance, the challenged MFC clause also requires distributors

to give DLA the benefit of deviated prices negotiated by customers directly with manufacturers for which USF and other large distributors cannot make purchases for their general inventory. Not only would USF be required to find the best delivered price of any of its almost 250,000 customers, USF would not be able to make the purchase at such price for the benefit of DLA because such pricing is available only to the customer that negotiated it.

Id. at 26. USF is justified in its envisioned parade of horribles, as this was the interpretation confirmed by DLA Troop Support. See AR 1130-34.

Defendant rejoins that the MFC clause is used by GSA and that DLA Troop Support made the reasonable determination that it was necessary for the Government to receive the lowest price for the same products that a contractor offers to its commercial customers "without regard to whether the Government is similarly situated to the customer receiving that price" because the price is subject to escalation under the EPA clause without competition. Def.'s Br. filed July 29, 2011, No. 39, at 32 (citing AR 4516-17). Defendant argues that, without this warranty, once the contract is awarded the contractor will have no incentive to negotiate a lower Delivered Price and pass on discounts and rebates "since the government will pay whatever price the contractor is willing to pay as long as it is reasonable." Id. at 33. Responding to USF's argument that it is "unfeasible" to provide MFC pricing, defendant reiterates that the MFC clause only applies to the Delivered Price

and that price differentials may be accounted for in the Distribution Price.  Id.  This explanation is inadequate to justify the application of this MFC clause.

While seeking transparency in pricing is certainly a legitimate procurement objective, the agency's rationale supporting this clause is patently disconnected from that objective. The MFC warranty requires that distributors remit to DLA Troop Support any deviated pricing arrangements between manufacturers and the offeror's other customers.  DLA Troop Support does not appear to grasp the difficulties imposed by this requirement.  The significant problems for distributors created by the MFC warranty were outlined in a letter dated June 8, 2011, to DLA Troop Support from [                   ], one of the few food distributors that submitted a (non-conforming) proposal.  See AR 6301-02.  Responding to the opening of negotiations on the Solicitation, the letter set forth the practical impossibility of compliance with the MFC provision:

> [              ] cannot make such a warranty because the manufacturer determines whether to offer a greater deviated price or discount to another customer, not [           ].  Historically, manufacturers have offered different discounts to different customers, based on purchase volumes and on direct contracting between the customer and manufacturer.  For example, one of [              ] commercial customers often contracts for a deviation greater than any of our other customers by guaranteeing the manufacturer a substantial annual quantity. Additionally, it is possible that a manufacturer may pass on a discount to a commercial or institutional customer who purchases significantly greater volumes than the Government that is larger than the discount received by the Government. [           ] does not determine these discounts, nor is [            ] authorized to pass these same discounts to any other customer, including the Government.

AR 6302.

It is certainly rational for DLA Troop Support to require distributors to pass on as an up-front reduction in the Delivered Price all rebates, discounts, and deviated pricing agreements that are authorized by manufacturers for DLA Troop Support.  But it is unreasonable to require distributors to "pass along" the benefit of pricing agreements made between suppliers and other customers when the distributors are not parties to the agreements that established these prices and the manufacturers have not authorized such an extension. The effect of this requirement is to penalize distributors for acting as the middlemen between two separate contracting parties—which is the primary purpose of all food-service distributors.  If the distributor does not set the price of the delivered goods, then it makes no sense to require the distributor to honor agreements to which it is not privy when dealing with the Government.

The MFC clause, moreover, requires that DLA Troop Support always receive the best price. That means that a deviated pricing arrangement could occur after the distributor has submitted a proposal and received the contract award. This clause would require that distributor to lower the price below what it proposed, thereby forcing it to accept a loss on all further deliveries of that item for the remainder of the contract. Defendant's responses to this conundrum are questionable. First, defendant has argued that these potential changes in pricing represent risks that offerors must accept when contracting with the Government. See Transcript of Proceedings, U.S. Foodservice, Inc. v. United States, No. 11-376C, at 64 (Fed. Cl. Aug. 17, 2011) ("Tr."). This is nonsense. The practical implications of the MFC clause entail more than a risk factor for the offerors; it is a provision that requires an unqualified representation that carries the potential for fraud prosecutions.

Second, DLA Troop Support tried to mollify potential offerors by assuring them that this automatic operate-at-a-loss situation was not a foregone conclusion. Offerors merely had to plan and prepare for this eventuality by factoring this possibility into their submitted Delivered Price. See Def.'s Br. filed July 29, 2011, No. 39, at 33. However, it does not appear that forcing offerors to submit a Delivered Price that includes elements that are completely untethered from ascertainable or predicable knowledge in any way advances DLA Troop Support's goals of increasing transparency and decreasing fraud. While it would still be transparent for offerors to conjure pricing information to account for uncontrollable deviated pricing arrangements, the potential for pass-through costs and fraud correspondingly would be present when no basis could exist for the numbers that any offeror would be proposing.

It is also problematic that DLA Troop Support does not even grasp the extent of the MFC clause it included. Contrary to what defendant argues, any comparison with the MFC clause used by GSA is misguided. As noted by USF, the GSA clause includes the requirements that the Government only receive the lowest price received by similarly situated customers. USF's Br. filed Aug. 5, 2011, at 19. The lack of the "similarly situated constraint" on what is required of offerors under the Solicitation is further evidence that DLA Troop Support has departed from the acceptable models practiced by other government agencies. 21/ Therefore, defendant has not offered a "reasoned chronicle" for inclusion of the MFC clause, and plaintiffs have shown that this MFC provision of the Solicitation is irrational.

---

21/ Perhaps most confusing for potential offerors was the fact that DLA Troop Support did not completely omit references to similarly situated customers in the Solicitation. While Amendment 0005 purportedly removed references to similarly situated customers from the SOW, references to similarly situated customers in section (b)(3) of the EPA clause were—so far as this court can tell—never removed from the Solicitation.

Although not the subject of a ruling, this court finds at least one other argument raised by Labatt that gives it pause: the 20 multiplier in the Distribution Price.  Labatt makes the astute observation that DLA Troop Support's rationale behind setting the multiplier at 20 was based on the percentage breakdown of the pricing components under the customary commercial practices that DLA Troop Support had been using.  See Labatt's Br. filed July 12, 2011, at 17-18.  As explained by DLA Troop Support, "[h]istorically, the Distribution Price equates to approximately 10% of the overall unit price in CONUS."  AR at 3920. Under the terms of the Solicitation, however, this could not possibly be the representative percentage of Unit Price of a particular item because—as illustrated by the bulk of this protest—DLA Troop Support then made the decision to realign how offerors should structure their categories of Delivered and Distribution Price.  Given that the object of the Solicitation was to take as many elements out of the variable Delivered Price and place them in the fixed Distribution Price, this court agrees with Labatt that, while the "proportion of total unit price Distribution Prices will represent under the current Solicitation is an unknown . . . certainly logic would dictate that if Distribution Price actually were 10% of total price without the protested revenue disclosure and transfer provisions, it must necessarily be a greater proportion of overall unit prices, not lesser . . . ."  Labatt's Br. filed July 12, 2011, at 18. Given that DLA Troop Support's methodology for applying a multiplier derived from the old accounting practices has lost its foundational inference, it is unclear whether or not the use of this multiplier as it stands could survive an arbitrary and capricious challenge.

3.  Overarching problem: no responses from the industry

Both USF and Labatt argue that the fact that DLA Troop Support received zero responsive offers to the new terms of the Solicitation evinces that the Solicitation unduly restricts competition.  See USF's Br. filed Aug. 5, 2011, at 13-14 ("USF (and presumably other offerors) did not reject the solicitation terms because they merely did not like them, but because they impose upon distributors unbounded price and compliance risk and a basket of ill-defined requirements."); Labatt's Br. filed Aug. 5, 2011, at 5 ("[I]t is clear that the terms unduly restrict competition precisely because every offer received by the agency took exception to the challenged terms and indicated that the offeror could not and would not comply with those terms.").  Labatt also argues that

the challenged terms of the Solicitation have actually restricted competition to zero responsive offers.  The record shows that all offerors have refused to amend their proposals.  There is no objective basis upon which defendant can claim that this situation will change if the terms of the Solicitation do not change.

Id. at 7.  USF notes that this total refusal from industry is noteworthy because of the millions of dollars available to the winning proposal.  As USF succinctly commented, in such a

competitive industry, "[d]istributors do not lightly refuse significant business."  USF's Br. filed Aug. 5, 2011, at 14.

At the end of this torturous procurement process and the repeated—if decidedly unhelpful—back-and-forth Q & As between DLA Troop Support and industry, no conforming proposal was received.  Despite the fact that the Government was offering up $18,000,000.00 in business, not one food-service distributor was willing to meet the terms that DLA Troop Support set forth in the Solicitation.

This court reviews only the reasonableness of the agency's procurement action, not the wisdom of the action.  Market forces in the end will take precedence in deciding whether or not what the Government has asked for is acceptable to industry.  In other words, it is reasonable for the Government to ask, but mere reasonableness does not foreclose the possibility that industry will decline to participate.  In the case at bar, this court does find that DLA Troop Support's objective of increasing transparency to reduce fraud and avoid excessive pass-through charges to the Government is not only a reasonable goal, but a pragmatic one.  Moreover, as implied by the Federal Circuit in CHE Consulting, the court cannot hamstring the Government by preventing changes to procurement practice before actual problems arise.  See 552 F.3d at 1355.  If the agency decides that the procurement process can be improved upon, that determination is within the discretion of the agency.  However, regarding this particular Solicitation, although this court does not rely on the voices of industry in making its determination, it is significant that all potential participants in industry rejected the new terms.  While the absence of any responsive proposal does not demonstrate *per se* unreasonableness, it sends a signal to DLA Troop Support that things are more than amiss.

IV.  Other factors necessary for injunctive relief

In order to obtain an injunction, the Federal Circuit requires a protestor to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  Centech Grp., 554 F.3d at 1037 (citation omitted).  Plaintiffs have succeeded on the merits.  To complete the record, the court makes summary findings on the remaining three factors required for an award of injunctive relief.

Plaintiffs have established that they will suffer irreparable harm if the Solicitation is not enjoined.  If this court did not grant plaintiffs' request for an injunction, neither would be able to compete for this contract—the proposal period has closed—and not only plaintiffs, but others in the industry, would suffer the irrational MFC clause in the other related food-service solicitations released throughout the country.  As plaintiffs have established that the

MFC clause is so burdensome as to preclude any offeror from sensibly complying with its impositions, the conclusion follows that plaintiffs would be denied an opportunity to compete for a sizeable contract and collect the revenue thereunder.  Thus the court finds that failure to issue an injunction would irreparably harm plaintiffs.

Further, the harm defendant fears is hyperbolic.  Defendant has argued that, if the Solicitation is enjoined, "the Government will lose the ability to insist upon pricing terms that meet the government's minimum needs of increasing pricing transparency and reducing the potential for fraud in its contracts."  Def.'s Br. filed July 29, 2011, No. 39, at 43.  As explained above, these are  reasonable goals that DLA Troop Support may pursue, and the agency may continue to require that any proposals submitted conform to its pricing requirements.  But the Government may never insist upon offerors conforming to irrational terms.  Enjoining the Solicitation using this irrational MFC clause will not irreparably harm the Government, but will require DLA Troop Support to act within the bounds of reasonableness.

The balance of the hardships in this case does favor plaintiffs.  As the Solicitation stands, plaintiffs are all but prevented from submitting proposals because of the irrational MFC clause.  DLA Troop Support cannot reasonably put distributors at risk of sanctions for fraud should they be unable to substantiate MFC prices over which the distributors have no control and no possible way of accounting for or predicting.  And it does not appear that DLA Troop Support will suffer any corresponding harm from an order enjoining the terms of the Solicitation.  The proposal period has come to a close, and DLA Troop Support has not received any conforming proposals.  As admitted by defense counsel, the agency is not in a position to award this contract.  Tr. at 58.  Further, the delays in securing a new procurement contract for the Texas/New Mexico region can be covered through the issuance of bridge contracts on the existing procurement contracts—presumably what DLA Troop Support has resorted to during the period over which this procurement has extended.

Finally, the court must consider whether an injunction would be in the public's interest.  All government procurements should be conducted on as level and fair a playing field as possible, thereby allowing all potential offerors to compete evenly with one another.  This level of competition is ideal for the Government, and, in a competitive industry such as food-service distribution, it should be obtainable.  Indeed, even in this competition, major distributors were competing with one another right up to the deadline for submitting proposals in an effort to persuade DLA Troop Support to modify—or at least clarify—the terms of the Solicitation.  Ultimately, the playing field was skewed—not in favor of any particular offeror, but, by means of an irrational methodology, against all of them.  It is in the public interest to see a contract awarded.  While the public interest does not demand that DLA Troop Support concede all points to industry, neither can it impose irrational constraints on the competition for these contracts.  It is in the public interest to enjoin the Solicitation

in order to facilitate the reissuance of a food-service procurement solicitation with terms that actually allow potential offerors to compete fairly without fear of being held liable for fraudulent representations over which they have little to no control.

## CONCLUSION

Accordingly, based on the foregoing,

1.  Plaintiff's and plaintiff-intervenor's motions for judgment on the administrative record are granted, and defendant's cross-motion for judgment on the administrative record is denied.  The Clerk of the Court shall enter judgment for plaintiff and plaintiff-intervenor.

2.  Defendant, by the Defense Logistics Agency, DLA Troop Support, its officers, employees, and agents, are enjoined from conducting negotiations on Solicitation No. SPM300-10-R-0047 with the MFC clause in its present form and from issuing a solicitation for a prime vendor that contains the same MFC clause *in haec verba*.

3.  By October 11, 2011, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.

**IT IS SO ORDERED**.

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge